863 A.2d 297

**Keith A. LEE**

v.

**Gary CLINE.**

**No. 8, Sept. Term, 2003.**

Court of Appeals of Maryland.

Dec. 13, 2004.

246

Willie J. Mahone, Frederick (Kathleen A. Ellis, Piper Rudnick LLP, Baltimore, on brief), for petitioner.

Kevin Karpinski (Victoria M. Shearer, Allen, Karski, Bryant & Karp, Baltimore, on brief), for respondents.

Ralph S. Tyler, Elizabeth F. Harris, Tonya M. Osborne, Hogan & Hartson, LLP, Baltimore, for American Civil Liberties Union Foundation of Maryland and Public Justice Center.

David R. Rocah, Deborah A. Jeon, Baltimore, of counsel.

J. Joseph Curran, Jr., Atty. Gen., Laura C. McWeeney, Asst. Atty. Gen., Edward H. Hammond, Jr., County Atty., A. Frank Carven, III, County Atty., Philip S. Roberts, Asst.

County Atty., Mark G. Spurrier, General Counsel, for respondents

Argued before BELL, C.J.,* ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

ELDRIDGE, J.

The issues in this case are (1) whether the Maryland Tort Claims Act, Maryland Code (1984, 2004 Repl.Vol.), §§ 12–101 *et seq.* of the State Government Article, provides qualified immunity to state personnel for tort actions based upon violations of the Maryland Constitution, (2) whether the Maryland Tort Claims Act provides qualified immunity to state personnel for tort actions based upon certain common law "intentional" torts, and (3), if the Act does grant such qualified immunity, whether the plaintiff's evidence of malice was sufficient to generate a triable issue as to whether the immunity was defeated.

I.

As this case was resolved by a grant of the defendant Cline's motion for summary judgment, "[w]e review the record in the light most favorable to the non-moving party [here the plaintiff] and construe any reasonable inferences which may be drawn from the facts against the movant." *Walk v. Hartford Casualty,* 382 Md. 1, 14, 852 A.2d 98, 106 (2004). *See, e.g., Jurgensen v. New Phoenix,* 380 Md. 106, 114, 843 A.2d 865, 869 (2004); *Sadler v. Dimensions Healthcare Corp.,* 378 Md. 509, 533, 836 A.2d 655, 669 (2003); *Remsburg v. Montgomery,* 376 Md. 568, 579–580, 831 A.2d 18, 24 (2003); *Rite Aid v. Hagley,* 374 Md. 665, 684, 824 A.2d 107, 118 (2003); *Lovelace v. Anderson,* 366 Md. 690, 695, 785 A.2d 726, 728 (2001), and cases there cited.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Keith Lee is an African–American Maryland resident. He left his home on the outskirts of Frederick, Maryland, on the morning of Saturday, March 12, 1994, to run various errands in his BMW automobile. Lee made several stops, one of which was at a car wash at a gas station. Sometime later he noticed that his car's front license plate was missing. He correctly surmised that the plate had come off at the car wash, and he returned to the gas station to retrieve it. Lee found that the license plate was mangled so that he was unable to re-attach it to his car. He placed the plate on the rear floor of the automobile behind the driver's seat, and resumed his errands.

At about 3:00 p.m. on March 12th, while Lee was still running errands, he observed a police car, with overhead lights activated, following his car. When he pulled over, Frederick County Deputy Sheriff Gary Cline approached Lee's car and asked Lee to present his driver's license and automobile registration card. Lee did so, and asked Cline the reason for the stop. When Cline responded that the front license plate was not on Lee's automobile, Lee explained that the plate had fallen off at the car wash and showed Cline the mangled plate.

Deputy Sheriff Cline then asked Lee if he would consent to Cline searching the vehicle for illegal narcotics and weapons. Lee refused to consent to the search, and Cline retorted:

"I don't need your permission to search the car. I can get dogs in here and search it without your permission."

Lee still refused to consent to the search.

Next, Cline took Lee's driver's license and registration card, returned to his police car, and contacted by radio the Frederick County Emergency Communications Center. Cline provided the radio dispatcher with Lee's license plate number in order to check its status. According to the radio dispatch tape of the incident, this initial call from Cline to the dispatcher was at 3:11 p.m. About two minutes later, the dispatcher called Cline and informed Cline that the license plate was valid and would not expire until later in the year.

About a minute after being told that the license plate was valid, Cline again called the dispatcher and requested that the dispatcher "locate a canine [unit] and start him my way." The dispatcher replied that no canine units were available to send to that location. Two minutes later, however, at 3:16 p.m., the dispatcher contacted Cline and informed the deputy sheriff that a State Police canine unit was nearby and available. Cline requested that the canine unit be sent to his location, stating (emphasis supplied):

"I've got a *suspect* not being too cooperative. Already told me there's no way he's going to give me consent to search. Go ahead and start this way please."

Cline also asked the dispatcher about Lee's driving record and arrest warrant status. At 3:17 p.m., the dispatcher informed Cline that Lee's driver's license was valid, that Lee had no points, that Lee was not wanted by the police, and that he had never been involved with the criminal justice system.

The radio dispatch tape discloses that, at 3:22 p.m., a second deputy sheriff, Officer Henry, reported to the dispatcher "that he was on the scene as backup." Shortly thereafter, while Officers Cline and Henry were engaged in a conversation at the side of Cline's police car, Lee got out of his vehicle and stood by the front of his vehicle. According to Lee's deposition, he "had been sitting there [in the vehicle] for a good while. [His] legs were getting ... tired." Lee continued: "Then, after about 30 seconds, Officer Cline yelled, get back in your car," and Lee got back into the car.

A Maryland State Police trooper arrived on the scene at 3:30 p.m., with a dog. The trooper asked Lee if he had any drugs in the car, and Lee replied that he did not. The State trooper then circled Lee's car with the trooper's dog and indicated that there was no sign of drugs. The trooper then put the dog back in the State police vehicle and left. Following the departure of the State trooper, Cline gave Lee two warning tickets, which Lee signed. Cline returned Lee's driver's license and registration card, and Lee left the scene.

The radio dispatch tape shows that Cline reported the stop "cleared" at 3:42 p.m.

## II.

Lee filed a complaint in the Circuit Court for Frederick County against Deputy Sheriff Gary Cline, Frederick County Sheriff James W. Hagy, the Maryland State Police, Maryland State Police trooper Eric Fogle, and the County Commissioners of Frederick County. Lee alleged "that he was detained and searched because of a Frederick County Sheriff's Department practice which targets African–American males driving expensive cars. Such drivers allegedly fit the Department's drug courier 'profile.' " The complaint went on to state that "[a]t no time did defendants ... Cline or ... Fogle have probable cause, reasonable ... suspicion or any ground, to believe that a crime had been committed or that the Plaintiff was carrying drugs [of] any kind." Lee claimed that Cline and Fogle were guilty of an unreasonable search and seizure, that the police officers unlawfully detained and imprisoned him, and that the officers "intentionally discriminated against Plaintiff on the basis of race and failed to afford him equal protection of the law." Lee asserted that the Frederick County Commissioners were

> "aware of the Frederick County Sheriff's Department policy of utilizing a race-based drug courier profile and a policy of stereo-typing African–American males in late model luxury automobiles as 'suspicious' and criminal and these Defendants provide manpower and other resources in support of the Frederick County Sheriff's race-based policy."

Lee further alleged that the violations of his rights were knowing and "intentional, extreme, outrageous, and intolerable and offend[ed] generally accepted standards of decency, morality and fairness, and ... caused Plaintiff to suffer embarrassment, mental anguish and emotional distress."

Count I of Lee's original complaint charged a violation of his civil rights under 42 U.S.C. § 1983; he asserted that the stop violated his rights under the Fourth and Fourteenth Amend-

ments to the United States Constitution. In the next count, Lee alleged that the defendants' actions violated his rights under the Maryland Declaration of Rights. The remaining counts in the original complaint were non-constitutional common law claims of false imprisonment, invasion of privacy, and intentional infliction of emotional distress.

Lee filed in the Circuit Court two amended complaints, adding a count sounding in negligence and a count charging a "Violation of Title VI of the Civil Rights Act of 1964," 42 U.S.C. § 2000d and 28 C.F.R. § 42.104(b)(2). He also asserted that the "Defendants' acts were done with malice [and] deliberate indifference to and in knowing violation of Plaintiffs' legal and constitutional rights. . . ." In addition, Lee alleged that the Maryland State Police officer's canine was a "large ferocious looking canine [which] caused Plaintiff to believe that he was not free to leave."

Following a ruling by the Circuit Court that, for several reasons, there was no basis for the asserted causes of action against Maryland State Police trooper Fogle and the Maryland State Police, Lee's second amended complaint abandoned his claims against those two defendants. Finally, Lee sought compensatory and punitive damages, as well as declaratory and injunctive relief.

Next, the remaining defendants removed the case from the Circuit Court for Frederick County to the United States District Court for the District of Maryland. Following discovery, various motions, other pleadings, and memoranda, the United States District Court dismissed the state law claims against Sheriff Hagy and the Frederick County Commissioners, granted the defendants' motion for summary judgment on the counts based upon federal law (*i.e.*, 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964), and declined to hear the counts against Cline based upon the Maryland Declaration of Rights and Maryland common law. The case was returned to the Circuit Court for Frederick County.

The defendant Cline then filed in the Circuit Court a motion for summary judgment which the court granted. The Circuit

Court held that there had been no violation of Lee's state constitutional rights, that Cline had qualified immunity under the Maryland Tort Claims Act with regard to the non-constitutional tort claims, and that the plaintiff had presented no evidence of malice to overcome Cline's qualified immunity.

Lee appealed, and the Court of Special Appeals affirmed, although the intermediate appellate court's reasoning differed somewhat from that of the Circuit Court. *Lee v. Cline,* 149 Md.App. 38, 814 A.2d 86 (2002). The Court of Special Appeals held that the Circuit Court erred in deciding that there was no triable issue with regard to the claimed violation of Lee's state constitutional rights. *Lee v. Cline, supra,* 149 Md.App. at 50–63, 814 A.2d at 93–101. The intermediate appellate court summarized (149 Md.App. at 63, 814 A.2d at 101):

> "We hold that there were material disputes regarding whether Cline prolonged Lee's traffic stop while awaiting the arrival of the canine unit. In concluding that there was no evidence of a constitutional violation, the circuit court disregarded Lee's version of events and accepted Cline's, even though Cline could not remember anything about this particular traffic stop. That was error."

Nevertheless, the Court of Special Appeals held that the qualified immunity granted to state personnel, including deputy sheriffs, by the Maryland Tort Claims Act, "grant[ed] qualified immunity to State personnel on all types of tort claims," including "state constitutional torts" and intentional torts. 149 Md.App. at 65, 814 A.2d at 102. *See* Code (1984, 2004 Repl.Vol.), § 12–105 of the State Government Article, and Code (1974, 2002 Repl.Vol., 2004 Supp.), § 5–522(b) of the Courts and Judicial Proceedings Article.[1] The Court of Spe-

---

1. The Maryland Tort Claims Act, § 12–101 *et seq.* of the State Government Article, provides in § 12–105 as follows:

    "**§ 12–105. Immunity of State personnel.**

    State personnel shall have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article."

    Section 5–522(b) of the Courts and Judicial Proceedings Article states:

    "(b) *Same—State personnel.*—State personnel, as defined in 12–101 of the State Government Article, are immune from suit in courts of

cial Appeals went on to hold that "[w]e find no error in the circuit court's holding that Lee failed to proffer sufficient evidence of malice to overcome Cline's qualified immunity." 149 Md.App. at 89, 814 A.2d at 116.

Lee filed in this Court a petition for a writ of certiorari which presented the following three questions:

"I. Whether the Court of Special Appeals err[ed] in holding that [, under the Maryland Tort Claims Act,] Officer Cline had qualified immunity against state constitutional violations.

"II. Whether the Court of Special Appeals erred in holding that [, under the Maryland Tort claims Act,] Officer Cline had qualified immunity against state common law intentional torts.

"III. Whether the Court of Special Appeals erred in holding that there was insufficient evidence of malice to overcome any qualified immunity possessed by Officer Cline."

Cline did not file a cross-petition for a writ of certiorari challenging the Court of Special Appeals' holding that Lee had presented sufficient evidence of a violation of his state constitutional rights to generate a triable issue. This Court granted Lee's petition for a writ of certiorari, *Lee v. Cline*, 374 Md. 82, 821 A.2d 370 (2003). Our order granting the petition neither limited the issues nor added any issues. Accordingly, the only issues before us are the three questions presented by Lee's certiorari petition. Maryland Rule 8–131(b)(1); *R.A. Ponte Architects, Ltd. v. Investors' Alert Inc.*, 382 Md. 689, 694 n. 3, 857 A.2d 1, 3–4 n. 3 (2004); *Edwards v. Corbin*, 379 Md. 278, 287 n. 5, 841 A.2d 845, 850 n. 5 (2004), and cases there cited.

---

the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, Subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver."

 

### III.

We shall consider Lee's first two questions together, namely whether the Maryland Tort Claims Act grants qualified immunity to state personnel for tortious acts or omissions, within the scope of the state employees' public duties, when those acts or omissions involve violations of state constitutional rights or constitute so-called "intentional" torts.

### A.

With one major exception not involved in the present case, the immunity granted to state personnel by the Maryland Tort Claims Act is generally co-extensive with the coverage of the statute. *See* § 5–522(b) of the Courts and Judicial Proceedings Article. If this case had involved the language of the Maryland Tort Claims Act as it existed prior to July 1, 1985, Lee's argument would have considerable merit. His argument, however, finds no support in the present statutory language.

The General Assembly originally enacted the Maryland Tort Claims Act by Ch. 298 of the Acts of 1981, waiving the State's governmental immunity with respect to six categories of claims. These six categories were limited to specific types of negligence actions such as the negligent operation or maintenance of a motor vehicle, negligence by a state health care employee, defective conditions in state structures or property, and negligent actions by state employees in state parks or recreation facilities. These six categories would not have encompassed intentional torts or tort actions based upon constitutional violations.

Nevertheless, by Ch. 538 of the Acts of 1985, effective July 1, 1985, the coverage of the Tort Claims Act was broadened to include tort actions generally, with certain specified exceptions and limitations. Section 12–104(a)(1) of the State Government Article now provides that "the immunity of the State and of its units is waived as to a tort action, in a court of the State...." Neither intentional torts (in the absence of malice), nor torts based upon constitutional violations, are excluded. In fact, a

1989 bill (House Bill 364), which would have excluded constitutional torts, did not pass. This history was summarized in *Ritchie v. Donnelly*, 324 Md. 344, 374 n. 14, 597 A.2d 432, 447 n. 14 (1991), as follows:

"As a result of 1985 amendments to the Maryland Tort Claims Act, the statute does not exclude specified categories of torts except claims arising 'from the combatant activities of the State Militia during a state of emergency,' § 5–399.2(a)(3) of the Courts and Judicial Proceedings Article. Otherwise, 'tort actions generally' are encompassed, *Simpson v. Moore*, 323 Md. 215, 219, 592 A.2d 1090, 1092 (1991), as long as the state employee's actions were not malicious, grossly negligent, or outside the scope of employment, *Boyer v. State, supra*, 323 Md. at 579, n. 14, 594 A.2d at 131, n. 14; *Sawyer v. Humphries*, 322 Md. 247, 253, 587 A.2d 467, 470 (1991). House Bill 364 of the 1989 Session of the General Assembly would have provided that '[i]mmunity is not waived' under the Maryland Tort Claims Act for 'any state ... constitutional claim.' In the course of the bill's legislative process, this provision was amended out. Ultimately House Bill 364 did not pass."

*See also, e.g., Shoemaker v. Smith*, 353 Md. 143, 156–158, 725 A.2d 549, 556–557 (1999); *Condon v. State of Maryland*, 332 Md. 481, 492–493, 632 A.2d 753, 758–759 (1993); *Sawyer v. Humphries*, 322 Md. 247, 253–254, 587 A.2d 467–470 (1991); *Rucker v. Harford County*, 316 Md. 275, 297–302, 558 A.2d 399, 409–412 (1989); *Clea v. Mayor and City of Baltimore*, 312 Md. 662, 671, 541 A.2d 1303, 1307 (1988).

The current language of the Maryland Tort Claims Act plainly appears to cover intentional torts and constitutional torts as long as they were committed within the scope of state employment and without malice or gross negligence. There are no exceptions in the statute for intentional torts or torts based upon violations of the Maryland Constitution. This Court has been most reluctant to recognize exceptions in a statute when there is no basis for the exceptions in the statutory language. *See, e.g., O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004) ("When interpret-

ing a statute, we assign the words their ordinary and natural meaning. * * * We will not ... 'judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature' "); *Nesbit v. GEICO*, 382 Md. 65, 75, 854 A.2d 879, 885 (2004); *Melton v. State*, 379 Md. 471, 477, 842 A.2d 743, 746 (2004); *Salamon v. Progressive Classic Insurance Company*, 379 Md. 301, 311–316, 841 A.2d 858, 865–868 (2004); *Piscatelli v. Board of Liquor License Commissioners*, 378 Md. 623, 630–633, 837 A.2d 931, 936 (2003); *Blind Industries and Services of Maryland v. Maryland Department of General Services*, 371 Md. 221, 231, 808 A.2d 782, 788 (2002); *Western Correctional Institution v. Geiger*, 371 Md. 125, 142, 807 A.2d 32, 42 (2002).

While this Court has not, until today, directly decided whether intentional torts and constitutional torts are covered by the Maryland Tort Claims Act, thereby granting state personnel qualified immunity for such torts, our prior opinions do support such coverage. *See Larsen v. Chinwuba*, 377 Md. 92, 99, 107–109, 832 A.2d 193, 196, 201–202 (2003) (A tort action against the Insurance Commissioner setting forth causes of action for defamation, invasion of privacy, abuse of process, and violation of rights guaranteed by the Maryland Declaration of Rights, and this Court held that the Commissioner was entitled to immunity under the Maryland Tort Claims Act, although the issue before the Court concerned scope of employment rather than the basic coverage of the statute); *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000) (A tort action against state governmental officials based upon allegations of various common law intentional torts, violations of the federal constitution, and violations of the state constitution, and the issues included (1) the sufficiency of the evidence to show malice, thereby defeating Maryland Tort Claims Act immunity, (2) liability under 42 U.S.C. § 1983, and (3) the inapplicability of the public official immunity doctrine to state constitutional torts; the Court held, *inter alia*, that there was sufficient evidence of malice to defeat Maryland Tort Claims Act immunity, although no other issue was raised regarding the coverage of the Act); *DiPino v. Davis*, 354 Md. 18, 49–56,

729 A.2d 354, 370–374 (1999) (Holding that there was coverage under the Local Government Tort Claims Act for certain intentional and constitutional torts): *Ashton v. Brown*, 339 Md. 70, 107–108, 123–124, 660 A.2d 447, 465–466, 473–474 (1995) (same); *Ritchie v. Donnelly, supra*, 324 Md. at 374–375 n. 14, 597 A.2d at 446–447 n. 14 (Suggests that the statutory immunity under the Maryland Tort Claims Act applies to non-malicious constitutional and intentional torts); *Sawyer v. Humphries, supra*, 322 Md. at 252–262, 587 A.2d at 469–474 (Held that intentional torts may be covered by the Maryland Tort Claims Act, although the issues raised concerned scope of employment and malice).

## B.

Despite the statutory language and the above-cited cases, Lee argues that the immunity granted by the Maryland Tort Claims Act should have no application to state constitutional torts or intentional torts. Lee chiefly relies upon opinions dealing with common law public official qualified immunity for discretionary acts.

██ As Lee correctly points out, this Court has consistently held that Maryland common law qualified immunity in tort suits, for public *officials* performing *discretionary* acts, has no application in tort actions based upon alleged violations of state constitutional rights or tort actions based upon most so-called "intentional torts." The Maryland public official immunity doctrine is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct.[2] *See e.g., Muthukumarana v. Montgomery*

---

2. The common law public official immunity doctrine has to some extent been codified in Code (1974, 2002 Repl.Vol., 2004 Supp.), §§ 5-507(b)(1) and 5-511(b) of the Courts and Judicial Proceedings Article. This Court has "pointed out that the purpose of these provisions 'was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries.' " *Lovelace v. Anderson*, 366 Md. 690, 704, 785 A.2d 726, 734 (2001), quoting *Ashton v. Brown*, 339 Md. 70, 116 n. 23, 660 A.2d 447, 470 n. 23 (1995).

*County,* 370 Md. 447, 478–481, 805 A.2d 372, 390–392 (2002) (discussing the public official immunity doctrine); *Lovelace v. Anderson, supra,* 366 Md. at 705–706, 785 A.2d at 734 ("[T]he defense of public official immunity generally applies only to negligent acts. * * * The defense is not applicable 'in an action based on rights protected by the State Constitution.'" It is also inapplicable where "a special relationship exists between the [official] and the injured person"); *Okwa v. Harper, supra,* 360 Md. at 201, 757 A.2d at 140 ("A state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is *not* entitled to" public official immunity); *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 134–139, 753 A.2d 41, 58–61 (2000) (reviewing both the history and the scope of the common law public official immunity doctrine); *DiPino v. Davis, supra,* 354 Md. at 49, 51, 729 A.2d at 370, 371 (Public official immunity "[p]rinciples apply to negligent conduct, not to intentional conduct. * * * [There is no public official] immunity in an action based on rights protected by the State Constitution"); *Ashton v. Brown, supra,* 339 Md. at 117, 660 A.2d at 470 ("[T]he plaintiffs' nonconstitutional tort claims are not limited to negligence, but include several so-called intentional torts. Public official immunity is not a defense to these intentional torts"); *Parker v. State,* 337 Md. 271, 285, 653 A.2d 436, 443 (1995) (contrasting limited public official immunity with the much broader judicial immunity under Maryland law); *Ritchie v. Donnelly, supra,* 324 Md. at 370, 597 A.2d at 445 (reviewing the public official immunity doctrine and holding "that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages"); *Clea v. City of Baltimore, supra,* 312 Md. at 680, 541 A.2d at 1311 (refusing "to extend [public official] immunity to damage actions against public officials who violate Maryland constitutional rights"); *Ashburn v. Anne Arundel County,* 306 Md. 617, 621–624, 510 A.2d 1078, 1080–1081 (1986) (Public official immunity is limited to negligent acts arising "from the performance of [the official's] job in a manner which involved judgment and discretion"); *Cox v.*

*Prince George's County,* 296 Md. 162, 169, 460 A.2d 1038, 1041 (1983) ("[A] police officer does not enjoy [public official] immunity if he commits an intentional tort or acts with malice"); *James v. Prince George's County,* 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980) (Public official immunity applies only to an official's "negligent acts"); *Carr v. Watkins,* 227 Md. 578, 583–586, 177 A.2d 841, 843–845 (1962) (Distinguishing, for purposes of defamation actions, the broad immunity enjoyed by federal officials under federal law, from the limited immunity granted to Maryland officials under Maryland law); *Mason v. Wrightson,* 205 Md. 481, 487, 109 A.2d 128, 131 (1954) ("When a peace officer goes beyond the scope of the law [, here an unlawful search and arrest,] he may become liable civilly and is not shielded by the immunity of the law"); *Heinze v. Murphy,* 180 Md. 423, 434, 24 A.2d 917, 922 (1942) ("[T]he law tolerates no abuse of power," and thus a police officer making an unlawful arrest was held liable for compensatory damages); *Dunne v. State,* 162 Md. 274, 284–288, 159 A. 751, 755, *appeal dismissed,* 287 U.S. 564, 53 S.Ct. 23, 77 L.Ed. 497 (1932) (Public officials do not have the immunity of the State when they enforce an unconstitutional act); *Weyler v. Gibson,* 110 Md. 636, 653–654, 73 A. 261, 263 (1909) (refusing to extend immunity to a public official violating the plaintiff's constitutional rights).

There are, however, major differences between the policy underlying public official immunity and the policy underlying the immunity under the Maryland Tort Claims Act. There are sound reasons for the strict limitations upon the doctrine of public official immunity, and those reasons have little or no applicability to the statutory immunity granted by the Tort Claims Act. Consequently, judicial opinions dealing with the well-established limitations upon public official immunity furnish no authority for judicially creating similar limitations upon the broad statutory immunity granted by the Tort Claims Act.

■ The purpose of the Maryland public official immunity principle is to insure that a public *official* (and not just any government employee), in the performance of "an important

public duty," " 'has the freedom and authority to make decisions and choices.' " *James v. Prince George's County, supra,* 288 Md. at 324, 326, 418 A.2d at 1178, 1179, in part quoting *Clark v. Ferling,* 220 Md. 109, 113, 151 A.2d 137, 139 (1959). The principle is aimed at permitting a public official to " 'act according to one's judgment in the absence of a hard and fast rule.' " *James,* 288 Md. at 326, 418 A.2d at 1179, quoting *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861, 864 (1940). Thus, the situation where public official immunity is applicable involves a tort claim based upon alleged mis-judgment or a negligent exercise of judgment by a public official. The doctrine is intended to be a defense against claims that a "better choice" could have been made by an official. This defense is inherently related to actions based on negligence. Most alleged "intentional torts," on the other hand, do not involve legitimate public policy choices or actions " 'in the absence of a hard and fast rule.' " *James,* 288 Md. at 326, 418 A.2d at 1179.

■ The immunity under the Maryland Tort Claims Act, however, is not inherently related to negligence actions in contrast to intentional tort actions. The purpose of the Tort Claims Act's immunity is not simply to protect judgmental decisions by officials. Instead, the purpose of the Tort Claims Act's immunity is to insulate state employees generally from tort liability if their actions are within the scope of employment and without malice or gross negligence. This broader purpose fully applies to non-malicious intentional torts and constitutional torts.

There is another reason, justifying the strict limitations upon public official immunity, which is inapplicable to statutory immunity under the Maryland Tort Claims Act. The principle of public official immunity is not, and has never been, tied to a waiver of sovereign or governmental immunity. Under circumstances where sovereign or governmental immunity is applicable, and where public official immunity is also applicable, the person injured by governmental tortious conduct will have no remedy. For this reason, any significant expansion of

public official immunity might well present serious constitutional problems under Article 19 of the Maryland Declaration of Rights.[3]

Nevertheless, with regard to torts encompassed by the Maryland Tort Claims Act, the statute generally waives sovereign or governmental immunity and substitutes the liability of the State for the liability of the state employee committing the tort. Accordingly, where the immunity of the Tort Claims Act is applicable, the injured party will ordinarily be able to recover against the State as long as he or she complies with the procedural requirements of the Tort Claims Act.

The above-discussed distinction between public official immunity and Tort Claims Act immunity is particularly significant with regard to constitutional torts. This Court's holdings, that public official immunity is inapplicable in actions against public officials for violations of plaintiffs' rights guaranteed by the state constitution, is based squarely upon Article 19 of the Maryland Declaration of Rights. In *Clea v. City of Baltimore, supra,* 312 Md. at 680–681, 541 A.2d at 1312, we reviewed the seminal Maryland case concerning this issue:

"The matter of a public official's immunity from damages for a constitutional violation was apparently first ruled upon by the Court in *Weyler v. Gibson, supra,* 110 Md. 636, 73 A. 261. In that case, an enlargement of the Maryland Penitentiary encroached upon the plaintiffs' land, and the plaintiffs brought an action for damages against, among others, the Warden of the Maryland Penitentiary. With regard to the Warden's argument that he was entitled to the immunity of the State (110 Md. at 653, 73 A. 261), this Court responded as follows (*id.* at 653–654, 73 A. 261):

---

3. Article 19 of the Declaration of Rights provides as follows:

"**Article 19. Remedy for injury to person or property.**

"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land."

'JUDGE DILLON, in his work on the *Laws and Jurisprudence of Eng. & Am.*, 207, said: "That all of the original States in their first Constitutions and Charters provided for the security of private property, as well as life and liberty. This they did either by adopting, in terms, the famous thirty-ninth article of Magna Charta which secures the people from arbitrary imprisonment and arbitrary spoliation, or by claiming for themselves, compendiously, all of the liberties and rights set forth in the great Charter."

'Our Declaration of Rights (Article 19) declares that every man for any injury done to him in his person or his property ought to have remedy by the course of the law of the land, and (Article 23) [now Article 24] that no man ought to be deprived of his property, but by the judgment of his peers, or by the law of the land, and section 40, Article 3 of the Constitution prohibits the passing of any law authorizing private property to be taken for public use, without just compensation as agreed between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation.'

"After pointing out that the 'immunity of the State from suit ... [is] firmly fixed in our law,' this Court continued (*id.* at 654, 541 A.2d 1303):

'But it would be strange indeed, in the face of the solemn constitutional guarantees, which place private property among the fundamental and indestructible rights of the citizen, if this principle could be extended and applied so as to preclude him from prosecuting an action ... against a State Official unjustly and wrongfully withholding property. . . .'

"Thus, the Court in *Weyler* flatly refused to extend the State's governmental immunity to a public official violating the plaintiffs' constitutional rights, including those under Article 24 of the Declaration of Rights."

The Court in *Ashton v. Brown, supra,* 339 Md. at 105, 660 A.2d at 464–465, after reviewing numerous earlier cases, concluded:

"Thus, the principle that individual state officials should not be immune from suit for state constitutional violations is bound up with the basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong."

*See also Piselli v. 75th Street Medical,* 371 Md. 188, 205, 808 A.2d 508, 518 (2002); *Dua v. Comcast Cable,* 370 Md. 604, 644, 805 A.2d 1061, 1084 (2002); *Robinson v. Bunch,* 367 Md. 432, 444, 788 A.2d 636, 644 (2002); *Doe v. Doe,* 358 Md. 113, 127–128, 747 A.2d 617, 624 (2000); *Ritchie v. Donnelly, supra,* 324 Md. at 370–374, 597 A.2d at 445–446.

While Article 19 generally prohibits a grant of immunity to both the governmental official and the governmental entity which tortiously violates a plaintiff's state constitutional rights, the effect of Article 19 upon non-constitutional torts is somewhat more fluid. The test is one of reasonableness. We recently summarized the applicable principle as follows (*Dua v. Comcast Cable, supra,* 370 Md. at 644, 805 A.2d at 1084–1085):

"This Court's opinions have also made it clear that Article 19 provides a measure of constitutional protection even for causes of action which are not based on constitutional rights.... *See, e.g., Robinson v. Bunch, supra,* 367 Md. at 444, 788 A.2d at 644; *Doe v. Doe,* 358 Md. 113, 128, 747 A.2d 617, 624 (2000); *State v. Board of Education, supra,* 346 Md. at 647, 697 A.2d at 1341; *Renko v. McLean,* 346 Md. 464, 484, 697 A.2d 468, 478 (1997); *Johnson v. Maryland State Police, supra,* 331 Md. at 297, 628 A.2d at 168; *Murphy v. Edmonds, supra,* 325 Md. at 365, 601 A.2d at 113. 'A statutory restriction upon access to the courts [in such cases] violates Article 19 ... if the restriction is unreasonable.' *Murphy,* 325 Md. at 365, 601 A.2d at 113."

And in *Piselli v. 75th Street Medical, supra,* 371 Md. at 205–206, 808 A.2d at 518, the Court stated (footnote and some internal quotation marks omitted):

"We have held that '[i]t is a basic tenet, expressed in Article 19 of the Maryland Declaration of Rights, that a plaintiff injured by unconstitutional state action should have a remedy to redress the wrong.'

\*          \*          \*

"Apart from these types of specific holdings with respect to Article 19, the constitutional provision generally prohibits unreasonable restrictions upon traditional remedies or access to the courts but allows the Legislature, pursuant to its authority to change the common law or statutory provisions, to enact reasonable restrictions upon traditional remedies or access to the courts. *Johnson v. Maryland State Police,* 331 Md. 285, 297, 628 A.2d 162, 168 (1993). . . ."

Nevertheless, with regard to both constitutional and non-constitutional torts, we have

"held that 'the Legislature may ordinarily substitute a statutory remedy, including a statutory administrative and judicial review remedy, for a common law remedy without violating Article 19 of the Declaration of Rights,' *Robinson v. Bunch, supra,* 367 Md. at 446–447, 788 A.2d at 645." *Piselli,* 371 Md. at 207, 808 A.2d at 519.

Earlier, in *Ritchie v. Donnelly, supra,* 324 Md. at 374 n. 14, 597 A.2d at 446–447 n. 14, the Court explained:

"The General Assembly, however, could provide that the State will be liable for damages resulting from state constitutional torts such as those alleged by the plaintiff in this case, and that the individual employee will be immune. In other words, the Legislature may substitute state liability for individual employee liability. The Legislature has done precisely this, under certain circumstances, in the Maryland Tort Claims Act, Code (1984, 1991 Cum.Supp.), §§ 12–101 through 12–110 of the State Government Article; Code (1974, 1989 Repl.Vol., 1991 Cum.Supp.), § 5–399.2 of the Courts and Judicial Proceedings Article. Moreover, the

sheriff of a county is a state employee within the meaning of the statute, § 12–101(6) of the State Government Article; *Boyer v. State*, 323 Md. 558, 572, 594 A.2d 121 (1991); *Rucker v. Harford County*, 316 Md. 275, 281, 558 A.2d 399, 402 (1989)."

Consequently, because of Article 19 of the Declaration of Rights, there is a substantial difference between public official immunity and the immunity granted by the Maryland Tort Claims Act. Article 19 precludes the application of public official immunity to constitutional torts. The same constitutional provision may operate to restrict an expansion of public official immunity with respect to non-constitutional torts if the restriction is held to be unreasonable. Article 19, however, does allow substitution of governmental liability in place of the liability of government-employed tortfeasors. Therefore, at least to the extent that the Maryland Tort Claims Act substitutes the liability of the State for the liability of the state employee committing a tort, the requirements of Article 19 are satisfied. This distinction between public official immunity and Tort Claims Act immunity fully justifies the difference in scope between the former and the latter.[4]

■ For all of the above-discussed reasons, we hold that the immunity under the Maryland Tort Claims Act, if otherwise applicable, encompasses constitutional torts and intentional torts.

---

4. There is one issue regarding the impact of Article 19 upon Maryland Tort Claims Act immunity which has not been raised in this case, which is not likely presented by the facts of the case, and upon which we intimate no opinion. The Tort Claims Act, in § 12–104(a)(2) of the State Government Article, caps the State's liability at $200,000, but the Act, in § 5–522(b) of the Courts and Judicial Proceedings Article, grants total immunity to state personnel for torts "for which the State or its units have waived immunity ... even if the damages exceed the [monetary] limits of that waiver." Whether Article 19 of the Declaration of Rights precludes the grant of immunity to state personnel, to the extent that damages exceed $200,000, is an issue which has not previously been decided by the Court. As indicated above, we express no opinion on the issue.

IV.

Although we agree with the Court of Special Appeals' holding regarding the type of torts covered by the Tort Claims Act's immunity provisions, we disagree with the intermediate appellate court's holding that there was insufficient evidence of malice to generate a triable issue. Viewing the evidence and the inferences therefrom in a light most favorable to the plaintiff Lee, we believe that there was sufficient evidence of malice.

One of the earliest cases that examined the issue of malice in the contest of qualified immunity granted by the Maryland Tort Claims Act was *Sawyer v. Humphries, supra,* 322 Md. 247, 587 A.2d 467. In that case, the plaintiffs claimed that the defendant, a state police officer, while off-duty, threw rocks at their car, and attacked one of the occupants. The trial court held that the officer was immune from suit under the Maryland Tort Claims Act, and the Court of Special Appeals affirmed. This Court reversed that judgment, *Sawyer v. Humphries,* 322 Md. at 261, 587 A.2d at 474, pointing out that

"[w]hen someone, without provocation or cause, throws rocks at two other persons, he is obviously demonstrating ill will towards those persons. Wrestling another to the ground, pulling his hair, and hitting him on the face, again without cause or provocation, is certainly malicious conduct."

A comprehensive discussion of malice, in the context of the Maryland Tort Claims Act, is found in *Shoemaker v. Smith, supra,* 353 Md. 143, 725 A.2d 549. In *Shoemaker,* two St. Mary's County sheriff's deputies were sued by a family after the deputies had forcibly removed the family's two minor sons from their home during an investigation by the St. Mary's County Department of Social Services of allegations of child abuse. Judge Wilner, writing for the Court, explained (353 Md. at 161, 163–164, 725 A.2d at 558–559, 560):

"[T]he General Assembly ... clearly and expressly retained a subjective element for immunity purposes. * * * The Legislature had decided that, when State personnel act

maliciously, they, and not the State, must bear the risk. The predominant and laudable public policy is to discourage State personnel from acting with malice in the performance of their public duties.

\* · \* \*

"The Court of Special Appeals has long applied . . . some standard of 'actual malice' in defining 'malice' for the purposes of . . . immunity under . . . State and local tort claims laws.

\* \* \*

"This, we believe is the appropriate test—the one the Legislature intended to be applied."

■ "Actual malice," in Maryland law, normally refers "to conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud....'" *Shoemaker v. Smith, supra,* 353 Md. at 163, 725 A.2d at 559, quoting *Montgomery Ward v. Wilson,* 339 Md. 701, 728–729 n. 5, 664 A.2d 916, 929 n. 5 (1995). The motive can exist even when "the conduct is objectively reasonable." *Shoemaker,* 353 Md. at 164, 725 A.2d at 560. This definition of malice was applied by this Court in *Okwa v. Harper, supra,* 360 Md. at 181–182, 757 A.2d at 129, where Judge Harrell, writing for the Court, said (emphasis supplied):

"Based on Appellees" version of the story, a fact finder, if given the opportunity, could conclude that Appellees acted without malice and did not commit the act of battery while arresting Mr. Okwa. The fact finder could find that any injuries suffered by Mr. Okwa were the product of his own resistive and combative efforts. Apparently this is the version of events that the trial judge opted to believe. The trial judge necessarily determined Appellees' accounts of the alteration to be more credible and based his ruling on them. This was an error. The summary judgment process is not properly an opportunity for the trial court to give credence to certain facts and refuse to credit others. *See Pittman v. Atlantic Realty Co.,* 359 Md. 513, 537, 754 A.2d 1030, 1042–1043 (2000) (citations omitted) (the trial judge is

not permitted to weigh evidence in deciding a motion for summary judgment); *Sheets v. Brethren Mut. Ins. Co.*, 342 Md. at 638, 679 A.2d at 542 ("[i]n granting a motion for summary judgment, the trial court does not resolve factual disputes, but instead is limited to ruling as a matter of law"); *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675, 677 (1995) ("the trial court does not determine facts, but instead rules on the motion [for summary judgment] as a matter of law").

"If a fact finder believed Mr. Okwa's rendition of the incident, however, it could infer reasonably that Appellees were motivated by an improper motive or that they had an affirmative intent to bring harm to Mr. Okwa. *See Shoemaker*, 353 Md. at 164, 725 A.2d at 560. It would not be unreasonable for a fact finder to infer that Appellees were motivated by an extreme and overzealous desire to punish Mr. Okwa for failing to obey immediately their instructions to walk away from the ticket counter and exit the terminal. *The alleged fact, if believed*, that police officers beat a citizen about his head and neck while they twisted his thumbs, *could support an inference that Appellees were inspired with malicious intention*. Such behavior fits the type of conduct which would strip the actor's immunity otherwise provided under the MTCA."

Thus, intent and motive are critical to the question of malice. In the instant case, the question raised for the purposes of immunity under the Maryland Tort Claims Act is whether a jury could reasonably find that Cline's conduct, given all the circumstances, was "motivated by ill will" or "by an improper motive." *Shoemaker*, 353 Md. at 164, 725 A.2d at 560. The case at bar is somewhat similar to the *Okwa* case with regard to the inferences which a jury might properly draw.

■ Lee's claim of malice is based on the following facts and inferences which are to be drawn in his favor. The traffic stop took far longer than warranted. Both parties' experts testified that the stop should have taken no more than fifteen

minutes. There is evidence in the record that Cline had completed similar stops in a shorter period of time, of between four and ten minutes. The record indicates that Cline had the information he needed to write the tickets within six minutes of the stop. Nonetheless, the stop took approximately forty minutes. During that time, Lee was clearly under arrest; Cline's order that Lee "get back" in the car reinforces this.

Cline requested the canine "search" after Lee declined to consent to the search of his vehicle, when there was utterly no evidence in the record justifying such a "search" of the vehicle. Lee was driving with a valid license; he had no points or restrictions on his license, and was not wanted by the police. Lee had a reasonable and valid explanation for driving without a license plate, which was the initial justification for the stop. Nonetheless, Cline referred to Lee as a "suspect," without any reason to label him as such. Cline told the dispatcher that Lee was not "cooperative." A jury might reasonably infer that the only factors which motivated Cline's calling Lee an uncooperative "suspect" were that Lee was an African–American male driving a luxury car who refused to consent to a search.

Lee argues, and we agree, that a "jury could infer . . . that Deputy Cline deliberately prolonged the stop because . . . Lee refused to consent to a search of his car." (Petitioner's brief at 16). Cline's request to search Lee's automobile when there was no basis for such a search, Cline's retort that he could search the vehicle without Lee's permission, Cline's insistence on obtaining a canine unit, Cline's "yelling" at Lee to get back into the car, the length of the stop, and Cline's reference to Lee as an uncooperative suspect, taken together, could support an inference of ill-will on the part of Cline. A jury issue with regard to malice was generated.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AND REMAND THE CASE TO THE*

*CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT CLINE.*