REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 85

September Term, 2014

_____

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF MARYLAND, *ET AL.*

v.

JOHN R. LEOPOLD, *ET AL.*

_____

Meredith,
Nazarian,
Leahy,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: May 28, 2015

*Judge Robert A. Zarnoch did not participate,
pursuant to Md. Rule 8-605.1, in the Court's
decision to report this opinion.

"Finishing second in the Olympics gets you silver.  Finishing second in politics gets you oblivion."

Richard M. Nixon[1]

John R. Leopold, then the Anne Arundel County Executive, was indicted in early 2012 for misconduct in office, based in part on allegations that he used his position to compile dossiers on his potential (or at least perceived) political challengers and enemies. Some of those individuals[2] and the American Civil Liberties Union Foundation of Maryland ("ACLU") (collectively "the appellants") requested copies of the information Mr. Leopold had assembled about them from Mr. Leopold (in his individual capacity and as County Executive), and James Teare (then the Anne Arundel County Chief of Police), or the custodian of records, under the Maryland Public Information Act ("PIA").[3]  Anne

---

[1] Robert Andrews, *Columbia Dictionary of Quotations* 269 (1993).

[2] The individual appellants include Jacqueline Allsup, Lewis Bracy, Karla Hamner, Marvenise Harris, Eugene Peterson, Thomas Redmond, Sr., Eric Scott, Mike Shay, John Singleton and Carl Snowden. (An eleventh plaintiff, Joan Harris, withdrew her appeal on September 11, 2014.)

[3] The PIA currently appears as Title 4 to the General Provisions Article of the Maryland Code.  *See* Md. Code (2014), § 4-101 *et seq.* of the General Provisions Article ("GP"). At the time of the appellants' requests and through the circuit court's disposition of this case, the PIA appeared in a different part of the Maryland Code.  *See* Md. Code (1984, 2009 Repl. Vol.), § 10-604 *et seq.* of the State Government Article ("SG").  The revisions substantially reorganized the PIA, but did not change any of the relevant language.  For the sake of consistency with the decisions below, we will cite here to the now-defunct sections of the State Government article.  *See Roth v. Dimensions Health Corp.*, 332 Md. 627, 636 (1993) ("As a general rule, statutes are presumed to operate prospectively.").

Arundel County (the "County") responded, over time, to these requests on their behalf, and the appellants were dissatisfied with the County's response.

The appellants sued in the Circuit Court for Anne Arundel County. Their amended complaint alleged that Mr. Leopold, Chief Teare, and the County (collectively, "the appellees") violated the PIA, and asked the court to compel the production of additional documents, enter a declaratory judgment, and award damages. The appellees filed a Motion to Dismiss and/or for Summary Judgment, the circuit court granted it, and this appeal followed. We agree with the appellees in large part, but we hold that the circuit court erred in dismissing Count I, in which the appellants alleged that the appellees violated the PIA by wrongfully compiling and using information about the appellants for use in Mr. Leopold's reelection campaign, and we remand for further proceedings on that count.

## I. BACKGROUND

Mr. Leopold's misconduct in office was the subject of a separate criminal case,[4] but that story sets the stage for the appellants' requests for information, the responses they received (or didn't) and from whom, and the PIA claims at issue here.

---

[4] *See Leopold v. State*, 216 Md. App. 586 (2014).

###### 1.  Mr. Leopold's conviction.

Mr. Leopold was indicted on March 2, 2012. Among other things, the Indictment alleged that he had used his Executive Protection Officers ("EPOs") [5] to compile information on his political opponents:

> [Mr.] Leopold directed on-duty [EPOs] to create dossiers on persons he viewed as political challengers, including but not limited to, Joanna Conti and Carl Snowden. The EPOs did not consider these people to be security risks.

After a bench trial, Mr. Leopold was found guilty of two charges of misconduct while in office.  The court found specifically that Mr. Leopold had wrongfully diverted County employees and resources to his election campaign, including the creation of dossiers (as we recounted in our reported opinion on appeal):

> It should have come as no surprise to [Mr. Leopold] that employing on duty sworn police officers to work on his election campaign was wrongful and illegal.  Section 13-303 of Article XXIV of the Maryland Code provides that an employee of a local entity may not be required to provide any political service.  Section 13-105 further provides that an employee of a local entity, which Anne Arundel County is a local entity, may not engage in political activity while on the job during working hours.

> * * *

> [Mr. Leopold], as an individual with decades of Governmental and election experience, was beyond a doubt aware that

---

[5] EPOs were Anne Arundel County police officers assigned to the Executive Protection Detail, which Mr. Leopold's predecessor had formed "for the purpose of provid[ing] security and protection to the County Executive while she was conducting County business." *Leopold*, 216 Md. App. at 591 (internal quotation marks omitted).

requiring [ ] on duty police officers to perform substantial services for his reelection campaign was wrongful and illegal.

* * *

By wrongfully taking substantial advantage of free public employee help for his campaign, an asset unavailable to his opponent, [Mr. Leopold] was placing his thumb on the scales of our political system to heavily tilt it in his favor. These actions robbed Anne Arundel County citizens of the fair political electoral process they were entitled to receive.

[Mr. Leopold's] actions were done systematically during the election season of 2010. [He] committed these acts knowingly, willfully and intentionally and under color of his office as County Executive. He did so corruptly and is guilty of this offense.

*Leopold*, 216 Md. App. at 600-01. The trial court barred Mr. Leopold from running for political office in Maryland for five years, sentenced him to a brief incarceration and house arrest followed by five years' probation, and ordered him to perform 400 hours of community service and pay a $100,000 fine. This Court affirmed his conviction on appeal, although we struck that portion of his sentence that prohibited him from running for public office.

### 2. The information requests.

Almost immediately after Mr. Leopold's indictment, the appellants began to investigate the existence and contents of the alleged dossiers. Most importantly for our purposes, the appellants served a series of PIA requests:

- *March 6, 2012 ("First Request")*: The ACLU served on "Mr. John Leopold (Or Custodian of Records), Office of the County Executive," and on "Chief James Teare (Or Custodian of Records), Anne Arundel County Police Department" a PIA request

4

for the "Leopold dossiers"[6] on Carl Snowden and Joanna Conti. The First Request included eleven numbered paragraphs, each seeking a category of records. The County responded by letter dated March 13, 2012 and attached a partial production.

- *March 16, 2012*: The ACLU served—again on Mr. Leopold and Chief Teare—the same requests as the First Request on behalf of thirteen more individuals. The County responded by letter dated March 30, 2012 and attached a partial production and supplemented its response to the First Request.

- *March 23, 2012*: The ACLU served on the same parties a supplemental request that named four more individuals. The County's March 30, 2012 letter also responded to this request.

- *April 3, 2012*:[7] The ACLU served the same requests as to another individual. The County responded by letters dated April 25, 2012 and June 28, 2012.

- *August 15, 2012*: The ACLU served on the Police Department a request for all "Criminal History Records Information" as to all of the individuals named in the first four Requests. The County responded by letters dated September 27, 2012 and October 10, 2012.

### 3. The County's responses.

The County responded to all five requests on behalf of all of the appellees. The County's response letters attached some responsive documents, but declined to disclose anything from two discrete categories of information. *First*, it declined to release to the ACLU certain tape-recorded interviews of Mr. Leopold's EPOs by Major Edward Bergin

---

[6] The parties use the term "Leopold dossiers" as borrowed from the Indictment and quoted above. We will refer to them as the "dossiers," but this should not be read as a finding that a dossier definitively exists for all of the named plaintiffs.

[7] Evidently the ACLU made an additional request on March 27, 2012, but it directed this request to the Maryland Criminal Justice Information System Central Repository and the Maryland State Police.

(and referred to as "the Bergin tapes").  According to Major Bergin, he became suspicious that Mr. Leopold had used the EPOs for improper purposes, so he interviewed two of them in March 2011 and turned the tapes over to the Maryland State Prosecutor's Office. The County indicated in its March 30, 2012 letter that the only additional responsive documents (*i.e.*, the Bergin tapes) were being withheld as "pertain[ing] to the pending criminal proceedings undertaken by the State Prosecutor's Office, which likely constitute evidence in that matter, and which will not be released at this time pursuant to [SG] § 10-618(f) of the MPIA." The County ultimately provided the tapes on March 4, 2013, after Mr. Leopold's trial was complete.

*Second*, the County declined to provide e-mails that were (as the appellants requested) "kept by, prepared by or for, or compiled by or for" EPO personnel "concerning any individual or group, whether or not at the explicit direction of [Mr.] Leopold." Although the County provided some responsive documents on June 28, 2012, the letter stated that the County would "continue to work on reviewing additional e-mails that may be responsive as well." It followed up on September 27, 2012, with a letter asking the appellants to narrow the scope of the requests due to the volume of potentially responsive emails:

> Each of the twenty two (22) County Executive staff employee electronic mailboxes for review includes an archived mail file and a trash file, both of which can contain anywhere from 10,000 to 15,000 or more documents to search. Consequently we are asking if you could please clarify and limit your search in some fashion to which we are able to respond.

So far as we can tell, the appellants did not narrow their requests.

### 4. The underlying litigation.

After the appellants filed their initial complaint on December 12, 2012, the parties exchanged letters and additional information, and the appellants amended their complaint and added Chief Teare as a defendant.[8] They ultimately alleged three categories of PIA violations:

- **Count One** (against Mr. Leopold, the County, and Chief Teare): "Improper Collection, Use, Creation and Dissemination of Government Records Containing Personal Information." The appellants alleged that the dossiers constituted personal records under the PIA and that there was "no legitimate governmental purpose" for the appellees to create them. The appellants relied on SG § 10-624(b) and SG § 10-626 (which we discuss further below).

- **Count Two** (against all defendants): "Improper Denial of Access to Public Records." The appellants alleged that the appellees violated the PIA "by failing to adequately search for responsive records, thus avoiding disclosure of responsive information," "by invoking inapplicable exemptions to the PIA as a basis for denying or temporarily denying" their requests, and when they "failed to respond to their requests for electronically stored information" (citing SG § 10-623(d)(1)).

- **Count Three** (against the County and Chief Teare): "Failure to Timely Petition for Continuance of a Temporary Denial." The appellants claimed that the appellees violated SG § 10-619 by withholding the Bergin tapes without seeking approval from the court (citing SG § 10-623(d)(2)).

For each count, appellants sought a declaratory judgment and asked the court to order the appellees to search for and provide all responsive documents. They also sought

---

[8] The Amended Complaint also named "Larry W. Tolliver in his official capacity as Anne Arundel County Police Chief." By the time the circuit court issued its opinion, Mr. Tolliver had been replaced by Kevin Davis.

7

"compensatory or nominal damages" for violation of their rights under the PIA, along with attorney's fees and "such other relief that is just and proper."

Mr. Leopold responded with a Motion to Dismiss or for Summary Judgment. On October 15, 2013, the County did the same, and Chief Teare followed with a Motion to Dismiss. The ACLU and the other appellants opposed these motions and filed a Motion for Partial Summary Judgment of their own on January 31, 2014. After a hearing, the circuit court issued a written order and memorandum opinion that granted the Motions to Dismiss of Mr. Leopold, the County, and Chief Teare as to Count I; granted the Motions for Summary Judgment of Mr. Leopold, the County, Mr. Davis, and Chief Teare as to Count II; and granted the Motions to Dismiss of the County, Mr. Davis, and Chief Teare as to Count III. The court also denied the appellants' motion for partial summary judgment. This appeal followed.

## II. DISCUSSION

> The public's right to information about government activities lies at the heart of a democratic government. Maryland's [PIA] grants the people of this State a broad right of access to public records while protecting legitimate government interests and the privacy rights of individual citizens.

Office of the Attorney General, Maryland Public Information Act Manual ("MPIA Manual") Preface (13th ed., October 2014).

If there were ever a law school class on the MPIA, this appeal would frame a great exam question. It covers all three of the PIA's core purposes—the public's right to information, the State's right to protect *legitimate* governmental interests, and individuals'

8

rights to privacy—although in different order,[9] and we agree with the circuit court's analysis as to two of the three counts. We disagree with the court's decision to dismiss the appellants' claims, in Count I, that the appellees misused public records and violated their privacy rights under the PIA (although we offer no views on the merits of those claims on this posture). But we agree that the appellees were entitled to dismissal of Count II, because the appellees did not improperly deny the appellants access to public records, and Count

---

[9] The appellants present the following questions on appeal:

1. Did the trial court err when it granted Appellees' motion to dismiss Count I, even though the Amended Complaint alleges in detail, and the undisputed facts support, that Appellees created, used, and disseminated government records containing personal information?

2. Did the trial court err when it granted summary judgment as to Count II in favor of Appellees, despite their failure timely to produce documents in response to Appellants' MPIA requests?

3. Did the trial court err when it granted Appellees' motion to dismiss Count III, even though the County failed to turn over certain responsive records and failed to comply with the MPIA's specified temporary denial procedure?

4. Did the trial court err when it denied Appellants' motion for partial summary judgment as to Count II based on the County Appellees' untimely responses to Appellants' MPIA requests?

5. Did the trial court err in denying Appellant's declaratory relief, despite the on-going dispute between Appellants and Appellees?

9

III, because the County withheld the Bergin tapes consistently with the legitimate government interest in the then-pending prosecution.

We review a successful motion to dismiss for errors of law:

> The standard of appellate review of a lower court's grant of a motion to dismiss is well-settled: "[i]n reviewing the underlying grant of a motion to dismiss, we must assume the truth of the well-pleaded factual allegations of the complaint, including the reasonable inferences that may be drawn from those allegations." *Debbas v. Nelson*, 389 Md. 364, 372 (2005) (citations omitted). We review these issues as a matter of law. *See Davis v. Slater*, 383 Md. 599, 604 (2004) (citations omitted).

*Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 578 (2014). We undertake a similar *de novo* review of a successful summary judgment motion. *Schmerling v. Injured Workers' Ins. Fund*, 368 Md. 434, 443 (2002). Because the trial court does not resolve any disputed issues of fact on that posture, *see* Md. Rule 2-501(a), "the standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct." *Beatty v. Trailmaster*, 330 Md. 726, 737 (1993). For the opposing party to defeat such a motion, it "must show that there is a genuine dispute as to a material fact by proferring facts which would be admissible in evidence." *Id.*

We consider the claims here against the overarching principle that, as its title suggests, the PIA is meant to encourage and facilitate *public* access to *information* in the hands of State government. To that end, the spirit of the PIA "'establishes a public policy and a general presumption in favor of disclosure of government or public documents,'" *Office of Governor v. Washington Post Co.*, 360 Md. 520, 544 (2000) (quoting *Kirwan v.*

10

*The Diamondback*, 352 Md. 74, 80-81 (1998)); *see also Comptroller of Treasury v. Immanuel*, 216 Md. App. 259, 265 (2014) ("The [PIA] grants the public the right to inspect public records in a way that favors public access."), so as a general matter we err on the side of disclosure. For the same reason, we interpret and apply disclosure exceptions narrowly. *Fioretti v. Maryland State Board of Dental Examiners*, 351 Md. 66, 77 (1998).

### A. Count I Stated A Claim.

Count I of the Amended Complaint focused on the alleged dossiers. The appellants alleged that the appellees violated SG § 10-624, and they sought to recover for those violations via SG § 10-626. The appellants alleged that they "suffered actual damages due to emotional distress," and sought declaratory relief, along with "actual compensatory or nominal damages" and attorney's fees.

The trial court held that the appellants were precluded from bringing this claim because, in its words, "recovery for emotional distress would be inapposite under the [PIA], in particular SG § 10-626." The court concluded first that a plaintiff in a PIA action must "meet a heightened burden of proof," *i.e.*, that he must prove his claims by "clear and convincing evidence." The court analogized to a tort claim for emotional distress, and reasoned that the appellants were required also to allege and prove "malice" to overcome Mr. Leopold's public official immunity defense:

> [A]n essential element in a cause of action alleging intentional
> infliction of emotional distress is that the conduct "must be
> extreme and outrageous," and "pled and proved with
> particularity." *Silkworth v. Ryder Truck Rental, Inc.*, 70 Md.
> App. 264, 271 (1987). To overcome public official immunity,

11

> a plaintiff must establish that the defendant acted with actual
> malice. *Thomas v. City of Annapolis*, 113 Md. App. 440, 456
> (1997). Plaintiffs admitted during oral argument . . . that the
> term "malice" does not appear in its First Amended Complaint.

(Footnote omitted.) In the end, the court declined to "broaden" the PIA to encompass what it viewed as a claim purely for emotional damages, and dismissed Count I. The court also interpreted SG § 10-626 not to provide a right of action for a violation of SG § 10-624(b), and therefore declined to enter a declaratory judgment.

The appellants argue here that the circuit court erred in analyzing both whether the appellees had violated the PIA and, if they did, whether the PIA afforded the appellants any remedy under either of the relevant provisions. *First*, SG § 10-624 defines "personal records" and the purposes for which State government may or may not create them:

> (a) In this section, "*personal record" means a public record*[10] that names or, with reasonable certainty, otherwise identifies an individual by an identifying factor such as:
>
> (1) an address;
>
> (2) a description;
>
> (3) a finger or voice print;

---

[10] Nobody disputes that the records the appellants requested, *i.e.*, the contents of the dossiers, satisfy the threshold PIA definition of "public records," "the original or any copy of any documentary material that: (i) is made by a unit or instrumentality of State government or of a political subdivision or received by the unit or instrumentality in connection with the transaction of public business; and (ii) is in any form, . . . ." SG § 10-611(h)(1). (The omitted portion of the subsection includes a non-exhaustive list of physical and electronic forms that public records might take.)

12

(4) a number; or

(5) a picture.

(b) (1) *Personal records may not be created unless the need for the information has been clearly established by the unit collecting the records.*

(2) Personal information collected for personal records:

(i) shall be appropriate and relevant to the purposes for which it is collected;
(ii) shall be accurate and current to the greatest extent practicable; and
(iii) shall not be obtained by fraudulent means.

*Id.* (emphasis added). The section goes on to give detailed guidelines about how an official custodian may collect personal records, and establishes reporting requirements (which are not at issue here). SG § 10-624(c)-(e).

*Second*, § 10-626 creates remedies for violations of the PIA but does not reference SG § 10-624 expressly. It does, however, provide that people who violate their obligations under the PIA *willfully and knowingly* are liable for actual damages, attorney's fees, and litigation costs:

(a) *A person*, including an officer or employee of a governmental unit, *is liable to an individual for actual damages that the court considers appropriate* if the court finds by clear and convincing evidence that:

(1)(i) *the person willfully and knowingly permits inspection or use of a public record in violation of this Part III of this subtitle*; and

13

(ii) the public record names or, with reasonable certainty, otherwise identifies the individual by an identifying factor such as:

    1. an address;
    2. a description;
    3. a finger or voice print;
    4. a number; or
    5. a picture; or

(2) [provisions not relevant here.]

(b) If the court determines that the complainant has substantially prevailed, the court may assess against a defendant reasonable counsel fees and other litigation costs that the complainant reasonably incurred.

*Id.* (emphasis added).

### 1. Violations and remedies under SG § 10-626

The appellants contend that the trial judge incorrectly read SG § 10-626 not to provide a civil remedy for violations of SG § 10-624, and that without one, § 10-624 has no teeth. They argue as well that Mr. Leopold violated SG § 10-626 independently when he "used" the dossiers in his campaign, whether or not he violated § 10-624 when he "created" them. Mr. Leopold and the other appellees counter that they merely compiled any dossiers from existing records, and thus that they did not "create" anything for purposes of SG § 10-624, and that Mr. Leopold did not "permit inspection or use of a public record" under SG § 10-626 even if he did use the dossiers for political purposes. We agree with

14

the appellants that the trial court read the interplay between SG § 10-624 and § 10-626 too

narrowly.[11]

We begin with the words of the statute, and from there apply well-accepted

principles of statutory construction:

> The primary indicator of the Legislature's intent is the language of the statute. *Whack v. State*, 338 Md. 665, 672 (1995). We interpret statutes to give every word effect, avoiding constructions that render any portion of the language superfluous or redundant. *Warsame v. State*, 338 Md. 513, 519 (1995); *see also* 2A Sutherland Statutory Construction § 46.06, at 119-20 (5th ed. 1992 & 1995 Cum. Supp.). In addition, we construe the statute as a whole, interpreting each provision of the statute in the context of the entire statutory scheme. *Warsame*, 338 Md. at 519 (citing *GEICO v. Insurance Comm'r*, 332 Md. 124, 132 (1993)); *see also* 2A Sutherland Statutory Construction § 46.05, at 103 (5th ed. 1992 & 1995 Cum. Supp.). If the statutory language, read in its entirety, is clear and unambiguous, and comports with the Legislature's purpose, we need not inquire further to discern the statute's meaning. *Mustafa v. State*, 323 Md. 65, 73 (1991).

*Blondell v. Baltimore City Police Dept.*, 341 Md. 680, 691 (1996).

Count I of the Amended Complaint cites generally to both SG § 10-624 and § 10-

626. In one paragraph, it alleges that "[t]here was no legitimate governmental purpose, nor

any clearly established need, for [appellees] to create government records of personal

---

[11] We also disagree with the trial court's analysis of the appellants' PIA claim as a tort claim for emotional damages. Count I states a purely statutory claim. And although there are, as we discuss, unresolved questions about the authority for and scope of remedies for violations of the PIA, SG § 10-626 unquestionably provides *some* cause of action, and the statute contains no suggestion that emotional distress is a required element of any PIA claim.

15

information about any [appellants], and the compilation, use, and dissemination of these records by [Mr.] Leopold, Anne Arundel County, and [Chief] Teare violated" § 10-624(b), then, in the next paragraph, alleges that these violations "give rise to claims" under § 10-626. This puts us into an analytical loop: § 10-626 provides that a person is liable "for actual damages that the court considers appropriate" after a finding (by "clear and convincing evidence") that he willfully and knowingly "*permit[ted] inspection* or *use* of a public record in violation of Part III of this subtitle*," a reference that encompasses § 10-624(b)(1). Although they do not say so in so many words, the appellants seem to view the act of compiling the dossiers as the creation of a new record unto itself, and thus the violation of § 10-624(b), whatever they might contain.

We say that the appellants *seem to view* the compilation of dossiers as "creating" a record because, on a close reading, the Amended Complaint does not actually allege this. To be sure, it alleges that dossiers were compiled, and wrongfully so. But it also groups forms of the verbs "create," "compile," "use," and "disseminate" whenever any one of them might apply, and never alleges that documents were created in connection with Mr. Leopold's improper political activity or that any of the documents the dossiers might have contained (and the Amended Complaint is understandably vague about their contents) was not properly in the hands of County government in the first place. The real gravamen of Count I is that personal records were compiled and used by individuals or agencies of County government who had not "clearly established" a need for them:

16

108. The records created, compiled, used, and disseminated by [appellees] about the [appellants] are "personal records" as defined by the MPIA, Md. Code Ann., State Gov't. § 10-624(a).

109. There was no legitimate governmental purpose, nor any clearly established need, for [appellees] to create government records of personal information about any [appellant], and the compilation, use, and dissemination of these records by [appellees] Leopold, Anne Arundel County, and Teare violated the MPIA, Md. Code Ann., State Gov't. § 10-624(b), which provides that "[p]ersonal records may not be created unless the need for the information has been clearly established by the unit collecting the records."

110. [Appellees'] violations of Md. Code Ann., State Gov't. § 10-624, give rise to claims against the [appellees] pursuant to Md. Code Ann., State Gov't. § 10-626.

The Amended Complaint does not, therefore, present the potential question about whether the act of compiling records already in government files into a new file is the creation of a new record. And we need not address it anyway because, we hold, the alleged collection, dissemination, and use by these appellees—the misconduct that the Amended Complaint actually alleges—stated a claim under SG § 10-626 by itself.

*First*, there's no question that SG §10-626 covers the same kind of records that SG § 10-624 does. Although SG § 10-626 uses the term "public records" rather than "personal records," it equates the two by defining "public records" for its purposes as having *all* the

17

characteristics that SG § 10-624 lists for personal records—address, description, finger/voice print, number, or picture.[12]

*Second*, SG § 10-626 imposes liability for improper inspection or use "in violation of this part III of this subtitle," SG § 10-626(a)(1)(i), a reference broad enough (Part III includes SG § 10-601 through SG § 10-628) to encompass conduct under SG § 10-624. The MPIA Manual, published by the Office of the Attorney General, sees the pairing too. It explains that SG § 10-626(1) "applies to personal records defined by [SG § 10-624]." (Emphasis omitted.) MPIA Manual 8-3. We recognize that § 10-624(b)(1) begins by stating that "[p]ersonal records may not be created," and that at first blush this language might seem to put us back into the same analytical loop as before. But there is no dispute that the documents at issue were legitimately "created" in the first place by whatever unit of County government possessed them in the first place, nor any dispute that County government had met the "established need" requirement of § 10-624(b)(1) before the records were collected by Chief Teare or others and compiled into dossiers. So the fact that records were legitimately in the possession, custody, or control of County government cannot immunize from liability the officials or agencies who later re-collected and misused records they independently would have lacked any clearly established need to collect.

_____

[12] And although headings inserted by publishers have no legal significance, the heading actually titles SG § 10-626 "Unlawful disclosure of *personal* records."

*Third*, Mr. Leopold tries to split hairs at this point by claiming that he (and others) did not violate SG § 10-626 because they didn't "use" the documents they compiled into dossiers. We disagree. The act of compiling the dossiers is a "use" of the documents they contained under any sensible definition of the word, even if the documents were already in hand for some other purpose. The dictionary definition, "the act or practice of employing something," Merriam-Webster Collegiate Dictionary 1378 (11th ed. 2011), already includes this notion of the term: the information put into the dossiers, once put there, was put to "use" in that new capacity. And Mr. Leopold "used" the records a second time when he looked to the information for campaign purposes. Without first having "clearly established" a need for the documents, Mr. Leopold should not have been "using" them at all, whether he wore his County Executive Hat or his Candidate Hat at the time.

Our reading of SG § 10-626 also squares with the purposes of the PIA. One general purpose—to encourage disclosure—doesn't really come into play here: obviously, the "disclosure" (which we address in a moment) is one the appellants would rather not have occurred. But another purpose is to protect privacy, and that purpose would be thwarted if the PIA is read to leave mandatory provisions like SG § 10-624 with no enforcement mechanism.[13] The penalty provisions of SG § 10-626 are meant to apply generally, and to

---

[13] That purpose finds further support in one of the PIA's early sections, which prohibits certain government entities from keeping unnecessary personal information in the first instance:

read that section to exclude violations of SG § 10-624 would leave citizens whose rights have been violated without a remedy under the statute[14] and defeat § 10-626's general remedial purpose, as well as the broader public policies underlying the PIA.

### 2. Mr. Leopold and Chief Teare cannot invoke public official immunity.

Mr. Leopold and Chief Teare contend that they are protected from liability under Count I by public official immunity. Again, we disagree. The trial court held that because the Amended Complaint didn't allege "malice" that the appellants could not defeat public

---

> *The State*, a political subdivision, or a unit of the State or of a political subdivision *may keep only the information about a person that*:
>
> (1) *is needed by the State*, the political subdivision, or the unit to *accomplish a governmental purpose that is authorized or required to be accomplished* under:
> (i) a statute or any other legislative mandate;
> (ii) an executive order of the Governor;
> (iii) an executive order of the chief executive of a local jurisdiction; or
> (iv) a judicial rule; *and*
>
> (2) *is relevant to accomplishment of the purpose.*

SG § 10-602 (now GP § 4-102) (emphasis added). Like the limitation in SG § 10-624, this provision contains no independent basis for recovery, but it demonstrates nonetheless the statute's purpose to keep personal information private except when a particular State need justifies retention.

[14] Although the trial court noted that the appellants could conceivably have a separate tort cause of action, the potential existence of such a remedy does not justify foreclosing recovery under the PIA.

official immunity. We don't see the absence of any allegation of "malice" as dispositive and, in fact, the doctrine doesn't apply here in the first place.

As the name of the doctrine suggests, public official immunity protects public officials from liability under certain circumstances in order to ensure that they are free to make decisions in the exercise of judgment "in the absence of a hard and fast rule." *James v. Prince George's Cnty.,* 288 Md. 315, 326 (1980) (citation omitted). The doctrine protects against errors in judgment that might expose an official to suit, and "is intended to be a defense against claims that a 'better choice' could have been made by an official." *Lee v. Cline*, 384 Md. 245, 261 (2004). But the doctrine also provides an exception: if a plaintiff can show that an official acted with gross negligence or malice, that official cannot be protected, and the parties here have gone straight to arguing that question.

That said, we see no basis on which Mr. Leopold or Chief Teare could invoke the doctrine in the first place, if we assume (as we must, for purposes of reviewing a motion to dismiss) that the allegations in the Amended Complaint are true. The Court of Appeals explained in *Houghton v. Forrest*, 412 Md. 578 (2010), that public official immunity "is reserved for public officials . . . who perform negligent acts during the course of their discretionary . . . duties." *Id.* at 585. But we also have explained that the doctrine "is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct." *Lee*, 384 Md. at 258. Because the doctrine protects people who make *mistakes*, it's reserved for negligence and similar actions and by its nature can't shield someone who is doing something illegal or beyond their job description. So

21

as we explained in *Lee*, "most alleged 'intentional torts' . . . do not involve legitimate policy choices or actions" of the type the doctrine protects. 384 Md. at 261. But because there is no legitimate policy choice that justifies malice on the part of the public official, a plaintiff who properly alleges malice gets the opportunity to prove it. *But see Baltimore Police Dep't v. Cherkes*, 140 Md. App. 282, 320 (2001) ("A conclusory allegation that a public official acted 'maliciously' without any supporting allegation of fact is insufficient to defeat a motion to dismiss on the ground of public official immunity.").[15]

The doctrine does not apply here *first*, because the acts alleged are, by their nature, intentional and not of the type protected by public official immunity. *Lee*, 384 Md. at 258. Again, SG § 10-626 requires proof of a willful and knowing violation of the PIA, so officials are already safe from claims that fall short of that pleading standard. *Second*, at the outset, the doctrine requires that conduct occur "while the actor was performing discretionary . . . acts" that he "must have performed . . . *within the scope of his official duties*." *Thomas v. City of Annapolis*, 113 Md. App. 440, 452 (1997) (emphasis added). Mr. Leopold (or Chief Teare, for that matter) cannot rationally claim that the conduct alleged here was grounded in "discretionary acts" falling within the "scope of their duties." The Amended Complaint alleges that Mr. Leopold "misused" EPOs, and improperly used

---

[15] The trial court unwittingly turned *Cherkes* inside out: where *Cherkes* suggests that alleging "malice" without more isn't enough, here the trial court held that saying everything *other than* "malice" wasn't enough. We don't believe either is the case—the right to immunity really depends on the circumstances surrounding particular conduct and the specific allegations in a given complaint.

22

the information they obtained for the dossiers, directed improper searches of criminal history databases with "no legitimate law-enforcement purpose," and disseminated personal records for purposes of the campaign.[16] If the allegations are true, both strayed well beyond the bounds of the duties of their offices and intentionally, whether or not maliciously, misused public information for illegal purposes. And as a result, neither was entitled to immunity as to Count I.

### 3. The ACLU may pursue its SG § 10-626 claim against the County.

In its Motion to Dismiss, the County argued that it cannot be liable for violating SG § 10-626 because it is not a "person" within the meaning of that term. Although the trial court referred to this argument in its opinion, it did not explicitly rule on the question, presumably because it dismissed the claims on the ground that SG § 10-626 did not apply. But the issue was "raised in" the trial court and it is "desirable to guide the trial court [and] avoid the expense and delay of another appeal" by addressing it now. Md. Rule 8-131(a).

Section 10-626 states that "[a] person, including an officer or employee of a governmental unit" is liable for permitting inspection or use knowingly and willfully. At the outset, this looks like a *person* must make the decision, not an organization. Nevertheless, the term "person" is defined elsewhere in the article to include not just

---

[16] To be sure, Chief Teare was not alleged to be the driver behind this scheme. But the Amended Complaint does allege that he acted with knowledge that dossiers contained information that violated local, State, and federal law.

individuals: "'Person' means an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any *partnership, firm, association, corporation, or other entity*." SG § 1-101(d).[17] (Emphasis added.) The broad purposes of the PIA counsel in favor of interpreting any ambiguity to include the County—the body for whom both Mr. Leopold and Chief Teare work, the public entity that possesses the records at documents at issue, and the government whose purposes the records were meant to fulfill in the first place. The Maryland Code includes numerous other instances where a "person" includes not just people, but groups, and where willfulness and intentional conduct may be imputed to such a body,[18] and although the linguistic fit isn't perfect, we err in this context on the side of public accountability.

---

[17] Again, we cite the provision that was in effect at the time of the circuit court's decision.

[18] *See, e.g.*, Md. Code (1974, 2007 Repl. Vol.), § 5-210.2 of the Agriculture Article (imposing civil penalties for "willfulness" of conduct and whether the violation was "known" by the wrong-doer, and defining "person" at § 1-101(g) as "the State, any county, municipal corporation or other political subdivision of the State, or any of their units, or an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or representative of any kind, or any partnership, firm, association, public or private corporation, or any other entity, unless otherwise provided"); Md. Code (2006, 2013 Repl. Vol.), § 10-402 of the Courts & Judicial Proceedings Article (prohibiting "willful" and "knowing" wiretapping and electronic surveillance by persons, which under § 10-401 includes "any employee or agent of this State or a political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation; Md. Code (1996, 2007 Repl. Vol.), § 9-413 of the Environment Article (imposing civil penalties for "willful" violations by "persons," defined under § 9-401 to include ". . . [a]ny State, county, municipal corporation, or federal agency; [a]ny special taxing area or district that operates a public water system; and [a]ny officer, agent, or employee of these").

### 4.      Available damages

In its opinion, the trial court leapfrogged over the liability issue and went directly to damages, and concluded that the appellants had pled only emotional damages that weren't recoverable under the PIA.  By doing so, the trial court prematurely denied the appellants any opportunity to litigate their damages.  (We express no opinion as to whether the appellants could, at this stage in the game, amend the Complaint to include other damages.) The trial court saw the Amended Complaint as pleading only emotional damages, then analyzed the availability of those damages against the pleading requirement for a claim of intentional infliction of emotional distress (citing *Silkworth*, 70 Md. App. at 271, for the proposition that a defendant's conduct must be "extreme and outrageous," for a plaintiff to recover).  But here, the availability of damages arises under the statutory remedy in SG § 10-626, which includes no such requirement.  Instead, SG § 10-626(a) provides for "actual damages" and, importantly, SG § 10-626(b) permits for an award of attorney's fees "[i]f the court determines that the complainant has substantially prevailed."

We agree that the "actual damages" language of the statute requires something other than emotional damages, and it may be that the appellants can amend the complaint to include a claim for, for example, reputational harm of the type noted by the appellants' counsel at oral argument.  *See, e.g.*, *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 587 (1976) (citing to the Supreme Court's opinion in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 393 (1974), in which that Court had held that with respect to damages in a defamation claim brought by a private individual, "'actual injury' was not confined to out-of-pocket loss, but

25

may include 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'"). But although we do not mean to suggest one way or the other that the appellants have or ultimately could demonstrate damages sufficient to satisfy the "clear and convincing evidence" standard of SG § 10-626, the trial court evaluated the allegations against the level of proof ultimately required at trial, not, as the motion to dismiss posture required, by assuming that the allegations were true.

Importantly, the appellants also sought the remedy of declaratory relief (in the form of a declaratory judgment to the effect that the appellees had violated SG § 10-626). The trial court didn't really address this point, but we do not see how that claim would be foreclosed simply because emotional damages are not available here. Moreover, there is no reason that the appellants couldn't establish a violation and be awarded nominal damages. *See Brown v. Smith*, 173 Md. App. 459, 483 (2007) ("When a court . . . makes a nominal damages award, . . . it need not focus on the injury to the plaintiff, but merely on recognition of the right." (citation omitted)). This might qualify as "substantially prevail[ing]" and entitle them to some award of counsel fees and litigation costs, even if their actual damages fall short. Again, we offer no views on the merits of the liability or damages issues but we reverse the trial court's decision to grant the appellees' Motion to Dismiss Count I, and remand for further proceedings consistent with this opinion.

**B.** **The Trial Court Properly Granted Summary Judgment On Count II.**

The appellants contend next that the trial judge improperly granted summary judgment to the appellees on Count II. In that count, the appellants sought further production of documents and complained of untimely disclosure. They argue not only that the trial court erred in granting the appellees' motion for summary judgment, but that it should have granted *their* motion for partial summary judgment because the appellees failed to provide timely responses to their PIA requests.[19] They also argue that the trial court erred when it held that Mr. Leopold and Chief Teare were not "custodians" of the records; that status arguably would have obligated each to respond to the appellants' requests independently and beyond the County's response. The County counters that it provided adequate responses within the required time period, and Mr. Leopold and Chief Teare each claim they did not serve as a custodian of records and the County responded adequately.

*First,* with respect to timeliness, the requests on their face covered a broad array of potentially responsive documents, and the back-and-forth regarding the scope of production revealed that producing them would not be a simple task. Although we agree that the statute provides for disclosure within 30 days, *see* SG § 10-614(b)(1) (and even

---

[19] It does not appear from the appellants' brief that they attack the trial court's decision to grant summary judgment to the appellees as to the *scope* of the PIA responses, but only as to timeliness.

27

states that the requester can only consent to a 30-day extension, SG § 10-614(b)(4)), the County *did* respond to the original request within thirty days with respect to each of the five requests. In a perfect world, the process would have moved more quickly, but we find no error in the circuit court's conclusion that the ongoing dialogue among the parties that followed represented a reasonable part of the process in light of the breadth of the requests.

*Second*, the trial court did not err in holding that Mr. Leopold and Chief Teare were not "custodians" of the requested records. So long as the County's response included all of the documents and records in the possession, custody, or control of the individual County employees who possessed potentially responsive materials—and the record reveals that it did—the PIA does not require the individuals to respond independently.

*Third*, we disagree with the appellants that the trial court misread *Ireland v. Shearin*, 417 Md. 401 (2010), to hold that Mr. Leopold and Chief Teare were not custodians. Mr. Ireland, a prison inmate, sought records relating to correctional institution medical providers by sending a letter to the institution's warden, and the warden (mis)directed him to make separate requests to each department. The circuit court dismissed Mr. Ireland's complaint, in which he alleged PIA violations and sought punitive damages, and the Court of Appeals reversed.

In that case, though, the higher-level official tried to kick the PIA responsibility down the chain of command. The Court of Appeals looked at SG § 10-611(c), which defines a custodian "as someone who is the 'official custodian' or 'any other authorized individual who has physical custody and control of a public record." "Official custodian,"

28

in turn, was defined at the time as "an officer or employee of the State or of a political subdivision who, whether or not the officer or employee has physical custody and control of a public record, is responsible for keeping the public record." The court concluded that a warden, whose position fell under the definition of "managing official," *see* Md. Code (1999, 2008 Repl. Vol.), § 1-101(k) of the Correctional Services Article, was an "official custodian." *Ireland*, 417 Md. at 409. As such, even if the warden believed that Mr. Ireland's requests were better directed elsewhere, it was incumbent upon him to "collect and assemble the requested records," rather than to pass that burden on to the requester. *Id.* at 410. The Court also pointed out that the warden *would* have complied with the PIA if he had "timely directed his subordinate departments to produce the requested records for inspection" instead of rejecting Mr. Ireland's request altogether. *Id.* at 411.

Here, on the other hand, the County assumed responsibility for responding on behalf of all of the appellees, including Mr. Leopold and Chief Teare. Chief Teare was no longer in office when the appellants added him to the Complaint, so he was not an "official" anything at that point, and the record reveals no suggestion that he had or controlled records beyond those in the County's files. And as to both Chief Teare and Mr. Leopold, the requests were directed to the individual employees or a custodian *in the alternative*: to "Mr. John Leopold *(Or Custodian of Records)*" at the Office of the County Executive, and to "Chief James Teare (*Or Custodian of Records*" at the Police Department. (Emphasis added.) Responses came from Lieutenant James Davis (who listed under his signature, "Custodian of Records for this Response" in one instance, and prefaced other responses

with "I am responding to these request as the Custodian of records for the Police Department.") David Abrams, as "Director of Communications," sent a first response to the ACLU "on behalf of the Office of the County Executive." We agree with the circuit court that those responses covered the parties from whom information was requested, and neither Mr. Leopold nor Chief Teare had an independent obligation to respond, at least in the absence of evidence that the County's response did not cover the individuals fully.

## C. The Trial Court Properly Granted The County's Motion To Dismiss Count III.

The parties treated the Bergin tapes differently from the remaining records because the County withheld them, for a time, on the grounds that the pending criminal proceedings against Mr. Leopold and the attendant investigation required them to do so. *See* SG § 10-618(f)(1)(i). The circuit court agreed with the County, and the appellants argue here that the tapes were not part of the investigation against Mr. Leopold, but instead were part of a *different* investigation—a brief investigation in spring 2011 relating to "rumors that certain EPOs were working excessive overtime." Counsel for the appellants conceded at oral argument, though, that if we were to agree with the circuit court that the tapes constituted part of the Leopold investigation, the County properly withheld them. Based on the affidavit that the County presented with its Motion for Summary Judgment, which the ACLU did not counter with any contradictory factual allegations, the circuit court properly determined that to be the case.

30

There are two different bases for disagreement here, but only one of them matters. *First*, the appellants claim that the County wrongly invoked SG § 10-618(f) to withhold the Bergin tapes because, they claim, the Bergin tapes (1) could only be withheld under SG § 10-619, which would have required the County to obtain a court order, and (2) weren't part of the prosecution of Mr. Leopold but of a different investigation. *Second*, the County claims that the Count III is moot in any event, because the Bergin tapes have been produced. We agree with the County that the issue is now moot, and we therefore decline to address the appellants' arguments.

A declaratory judgment action is moot where it "does not serve a useful purpose," *Polakoff v. Hampton*, 148 Md. App. 13, 27 (2002) (citation omitted). Although the appellants claim they are "in doubt as to [their] legal rights," citing *Carroll Cnty. Ethics Comm. v. Lennon*, 119 Md. App. 49, 58 (1998), we see no such doubt now that the Bergin tapes have been produced. *Hammen v. Baltimore Cnty. Police Dep't*, 373 Md. 440 (2003), does not compel a contrary conclusion. In that case, the Baltimore County Police Department declined to disclose a surveillance tape until Mr. Hammen consented to be deposed and the deposition took place. *Id.* at 447. By the time the case reached the Court of Appeals, the videotape had been disclosed, but the Court reached the merits anyway because, it held, the issue raised public concerns, was capable of repetition yet evading review, and because the Court believed it likely that "this same situation could repeat itself where a surveillance video is involved and the custodian of the record chooses to hold the

31

surveillance video in spite of the MPIA request until the person making the request agreed to first be deposed in the independent administrative proceeding." *Id.* at 452.

We agree with the trial court that "the matters asserted in the pending complaint are of the utmost interest and concern to the citizenry of Anne Arundel County and the State of Maryland." That said, the Bergin tapes were withheld, as the PIA permits, because they related to a pending criminal investigation that led ultimately to Mr. Leopold's conviction. Although Mr. Leopold's behavior reminds us that "[t]hose who cannot remember the past are condemned to repeat it," George Santayana, *The Life of Reason I* (quoted in *Bartlett's Familiar Quotations* 584 (18th ed. 2012)), the issues at stake in Count III are fundamentally fact-bound, and this case demonstrates ably that a similarly misguided future official's conduct will not evade review.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AS TO COUNT I, AFFIRMED AS TO COUNTS II AND III. COSTS TO BE PAID 66% BY APPELLANT AND 34% BY APPELLEES.**